[No. 13974. Department One. October 10, 1917.]

### G. H. DAHLSTROM, *Respondent*, v. NORTHERN PACIFIC RAILWAY COMPANY et al., *Appellants*.

### G. H. DAHLSTROM et al., *Respondents*, v. NORTHERN PACIFIC RAILWAY COMPANY et al., *Appellants*.[1]

RAILROADS—ACCIDENTS TO TRAINS—ACTIONS—NEGLIGENCE — QUESTION FOR JURY. In an action for personal injuries sustained by a passenger on a Milwaukee train, when it fell through an overhead trestle crossing, which ten minutes before had been damaged by a swinging crane on a Northern Pacific train passing underneath, the negligence of the Northern Pacific Company is for the jury where there was evidence that the failure of the Milwaukee train to stop in time was due to improper flagging by a Northern Pacific brakeman sent out to flag the train, who delayed and did not properly wave the flag, and also that the swinging crane should, on inspection, have been properly fastened to prevent its tearing out the trestle.

SAME. In such a case, the negligence of the conductor of the Northern Pacific in failing to send out sufficient flagmen is a question for the jury, where his failure to do so, as he claimed, was his

[1]Reported in 167 Pac. 1078.

want of knowledge that the trestle had been damaged, but witnesses in the vicinity heard the crash, saw the dust, and knew that the trestle had been damaged, and eight or ten minutes elapsed before the arrival of the Milwaukee train.

APPEAL—PRESERVATION OF GROUNDS—SPECIFIC OBJECTION TO EVIDENCE. Upon an issue as to the amount of hospital expenses, an objection that evidence of the amount of bills received by plaintiff was incompetent and immaterial did not raise the question that the evidence did not prove the reasonable value of the services rendered.

TRIAL—INSTRUCTIONS—REQUESTS. It is not error to refuse requested instructions sufficiently covered in the general charge.

DAMAGES — PERSONAL INJURIES — EXCESSIVENESS. A verdict for $1,000 for personal injuries is not excessive where plaintiff was cut over the eye, requiring three stitches, which left a noticeable scar, and he was bruised up generally with reference to the elbows, knees and hips.

SAME. A verdict for $16,000 for personal injuries sustained by a married woman in a train wreck is not excessive where it appears that she was eighteen years of age, was seriously internally injured requiring two operations, one for the removal of the right ovary and a cyst from the left, her ability to bear children was impaired, and might be entirely destroyed by the necessity of a further operation, and her health would not be restored for a long time, if at all.

NEW TRIAL—NEWLY DISCOVERED EVIDENCE. In a personal injury case, it is proper to deny a new trial for newly discovered evidence to the effect that plaintiff was up on a certain date after the accident at a time when she claimed to have been in bed, where the matter was not very material for the reason that no one then thought that her injuries would result in the serious development that followed.

MORRIS, J., dissents in part.

Appeal from judgments of the superior court for Pierce county, Chapman, J., entered August 2, 1916, upon verdicts rendered in favor of the plaintiffs, in consolidated actions for personal injuries sustained in a train wreck. Affirmed.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for appellants.

*Govnor Teats, Leo Teats,* and *Ralph Teats,* for respondents.

MAIN, J.—These two actions were brought for the purpose of recovering damages for personal injuries, and, by stipulation, were tried in the superior court as one action. In one action, damages are sought for the injury sustained by G. H. Dahlstrom; in the other, for injuries sustained by Lillian Dahlstrom, wife of G. H. Dahlstrom. The cases have been three times tried in the superior court, though this is the first appeal to this court. The jury returned separate verdicts; in one, finding a verdict in favor of G. H. Dahlstrom in the sum of $1,000; in the other, finding a verdict for the injuries which Mrs. Dahlstrom had sustained in the sum of $16,000. The defendants in each action are the Northern Pacific Railway Company and Jacob Heether, a conductor on one of its trains. Before the entry of the verdicts, a motion was made as to each of the defendants for a judgment notwithstanding the verdict and, in the alternative, for a new trial. Both of these motions were overruled, and judgments were entered upon the verdicts. From these judgments, the appeal is prosecuted.

The facts, which are either not in dispute or which the jury had a right to find from the evidence, are substantially as follows: The Northern Pacific Railway Company owned and operated a railway line from Tacoma, Washington, to Portland, Oregon. The Chicago, Milwaukee & St. Paul Railway Company owned and operated a line from Tacoma to the Grays Harbor country. Both these lines passed through a station called Rainier. About one mile north of this station, the Milwaukee road crossed over the Northern Pacific on a trestle. On the 2d day of July, 1915, the contracting firm of Porter Brothers, Grant, Smith & Company assembled their cars and material in the freight yards of the Northern Pacific Railway Company at Tacoma, for the purpose of having the same transported to Portland, Oregon. This outfit consisted of several cars of material and a hoisting crane. The hoisting crane was a twenty-ton lifting crane constructed on its own trucks. The body of the crane consisted of a revolving

turret, the machinery for its operation being enclosed in a cab or house on top of the trucks. The cab was a little wider than the width of the trucks, so that it extended about three inches over each side thereof when placed lengthways of the truck in a traveling position. When the cab was swung around at right angles to the truck, the end thereof extended out from the side of the truck some six or seven feet. Attached to the rear of the cab, or turret, was a boom, forty-five feet long, used for lifting heavy objects. In preparing the crane for shipment, it was necessary to attach a flat car to the rear thereof and chain the flat car and the crane together, so as to make them practically one car for operation purposes. The boom was then lowered onto the flat car and disconnected from the turret, except that the heavy cables which extended from the drum of the crane to the boom were not detached, but were slackened sufficiently so that there would be no strain on them. The crane was provided with rods which extended from lugs on the rear end of the frame of the trucks to the ash pan, which rods were intended to keep the crane in place and prevent it from swinging around and extending over the side of the truck. The crane, together with the other machinery and supplies, was prepared for shipment by employees of Porter Brothers, Grant, Smith & Company.

After the machinery had been prepared for shipment, the cars containing the same were inspected by the car inspector for the Northern Pacific Railway Company. The purpose of this inspection was to ascertain whether the cars had been so loaded as to be in reasonably safe condition for transportation. The cars which contained this machinery were placed in the rear of train No. 963, which was a local freight scheduled to leave Tacoma at about six o'clock, a. m., and arrive at Rainier at about 8:10 a. m., though on the morning of the 3d of July, 1915, the train left Tacoma something like an hour late. This train was in charge of Jacob Heether, one of the appellants, as conductor, the train crew consisting of the conductor, three brakemen, the engineer and the fireman.

The equipment of the contractors was accompanied by J. C. Burke, one of their employees. The train consisted of about forty cars and the caboose, the local freight being in the front end of the train. The train left Yelm at about 9:38 a. m., and the distance between Yelm and Rainier is approximately five miles.

After leaving Yelm, Frank Russell, the rear brakeman, and J. C. Burke, the employee of the owners of the machinery referred to, rode in the cupola of the caboose. Heether, the conductor, and the two other brakemen rode upon the top of a box car which was fourth from the engine. While the train was passing under the Milwaukee trestle, shortly before the car carrying the crane reached the trestle, the crane swung around so that it extended over the side of the car five or six feet. As the crane passed under the trestle in this way, it tore out a row of piles supporting the Milwaukee track. The boom was thrown from the car upon which it was riding and was dragged along until the train was brought to a stop. Russell, the rear brakeman, when he observed that the crane had swung around and that it would come into contact with the piles, applied the air to stop the train. The train, at this time, was traveling from fifteen to eighteen miles an hour, and was stopped after going a distance of about five hundred feet after the air was applied. When the train stopped, Russell, the rear brakeman, took two red flags which were in the caboose, gave one to Burke and directed him to go up the Northern Pacific track and flag any train that might be approaching.

After the train stopped, Heether and the two brakemen got down from the top of the car on which they were riding and started to walk towards the rear end of the train. Russell went upon the Milwaukee track for the purpose of flagging any train that might approach the trestle over that line. Eight or ten minutes after the Northern Pacific train stopped, a passenger train on the Milwaukee line, then due at the station of Rainier, approaching from Tacoma, ran upon

the weakened portion of the trestle. The engine went through, killing both the engineer and the fireman. The combination baggage and smoking car, in which G. H. Dahlstrom was riding, also went down. The day coach, in which Mrs. Dahlstrom was riding, likewise went through the broken trestle. This coach turned over and was badly wrecked. It is for the injuries sustained in this wreck that the actions were brought.

We will first consider the motion of the Northern Pacific Railway Company for judgment notwithstanding the verdict. The respondents claim that the company had been negligent in two respects: (a) In placing the crane in the car when the crane was in an unsafe condition for transportation; and (b) in failing to properly and timely warn the enginemen on the Milwaukee passenger train by flagging, or otherwise. As already stated, after the piling was torn out by the Northern Pacific train, eight or ten minutes elapsed before the Milwaukee train went down. Burke had gone some distance up the Northern Pacific track, and had flagged and stopped an approaching train. Russell, the rear brakeman, went upon the Milwaukee track, walked to the center of the trestle, where the piles had been torn out, tarried there for an appreciable space of time, turned, started to the north, and had proceeded some distance on the trestle, when the whistle of the Milwaukee train was blown, either for a crossing, or for the station of Rainier. He then, for the first time, began to wave his flag and run toward the train. He had just reached the end of the trestle, and had time to escape therefrom, when the train passed onto the trestle. When the train reached the weakened portion of the trestle, it was traveling very slowly, and could have been stopped in a distance of from twenty-five to fifty additional feet. Had Russell gone up the Milwaukee track, instead of proceeding first out to the weakened portion of the trestle, as he directed Burke to do in flagging trains on the Northern Pacific track, there can be no question but that the Milwaukee train could have been stopped in time to have avoided the accident. It is true that the appel-

lants' witnesses placed the time that elapsed between the breaking of the piles and the going down of the Milwaukee train at less than eight or ten minutes, but the jury, under the evidence, had a right to find that at least eight or ten minutes had expired.

There was also evidence that Russell did not flag the Milwaukee train in a proper manner, in that he extended the staff of the flag at right angles to his body and waved it back and forth across the track, when the proper method of flagging was to extend the staff of the flag perpendicularly over his head and wave it back and forth. In answering a special interrogatory as to whether anything prevented the engineer of the Milwaukee train from seeing the brakeman Russell flagging his train in time for him to have stopped the train before running upon the weakened portion of the trestle, the jury said, "improper flagging."

It is also probably true that there was sufficient evidence to justify the jury in finding that the crane had not been properly anchored or tied so that it would remain lengthways and not swing around; and that this defect should or could have been ascertained by reasonably careful inspection.

The next question is whether the motion for judgment notwithstanding the verdict should have been granted as to the conductor, Heether. There was evidence from which the jury could find that it was the duty of the conductor, when the Milwaukee trestle was weakened, if he knew the piles had been broken, to place flagmen immediately in three different directions—send one each way from the trestle on the Milwaukee line to warn and flag approaching trains, and another up the Northern Pacific track to warn trains approaching from the rear. The conductor, however, claims that he did not know the Milwaukee trestle had been damaged by the crane. A special interrogatory on this question was submitted to the jury as follows:

"At the time the Northern Pacific freight train stopped after the accident to the trestle, did conductor Heether or

brakemen Stoddard and Kimball, or either of them, know that
the trestle had been struck and damaged?"

This interrogatory was answered "Yes."

People living in the vicinity, and who were farther from the
trestle, heard the crash, saw the dust, and knew that the
trestle had been damaged. If eight or ten minutes elapsed
from the time of the damage to the trestle until the Milwau-
kee train went down, the jury had a right to find that the
conductor, in the exercise of reasonable care, could have
caused a brakeman to have proceeded up the Milwaukee
track, and thus flagged the train in time to have prevented
the accident. The motion for judgment notwithstanding the
verdict, as to each of the appellants, was properly overruled.
The question of negligence, both as to the Northern Pacific
Railway Company and as to the conductor, was for the jury.

There are a number of assignments of error which relate
to the rulings of the trial court upon the admission of evi-
dence and the scope of cross-examination in one or two in-
stances. These cases were actively contested on both sides,
in a trial that consumed six or seven days, and in such a trial,
slight errors are likely to creep in. Without reviewing the
errors here claimed in detail, it may be said that we have con-
sidered all of them, and no prejudicial error was committed
in the rulings objected to.

One assignment of error as to the admission of evidence will
be further considered. This assignment relates to the evi-
dence as to the hospital expense. Upon the trial, Mr. Dahl-
strom was permitted to testify as to the amount of the bills
which he had received for the hospital expense. This was ob-
jected to on the ground that it was "immaterial and incom-
petent." Under the holding in *Torgeson v. Hanford*, 79
Wash. 56, 139 Pac. 648, the evidence as to the amount of the
bills did not prove the reasonable value of the services for
which they were rendered, and there should have been other
evidence on the question of reasonable value. The objection
to this evidence, however, was not upon this ground, but was

the general objection of incompetent and immaterial. This was not sufficient to preserve the question. The specific reason for the objection should have been pointed out.

There are also a number of assignments of error as to instructions given and requests refused. In the instructions given we find no error. The law of the case was fully and properly stated to the jury. As to the requests refused, so far as these contained a correct statement of the law applicable to the facts, they were sufficiently covered in the instructions given.

It is claimed that the verdicts in both cases were excessive. As to G. H. Dahlstrom, he received a cut over the left eye, in which three stitches were taken, and which left a noticeable scar. He was bruised up generally, especially with reference to the elbows, knees and hips. This verdict is not so large as to enable us to say that the jury, in rendering it, was actuated by either passion or prejudice.

Mrs. Dahlstrom's injuries were more serious. When the coach in which she was riding went down, she was under the debris in a very greatly cramped position, with her knees and face in close proximity. The seventh rib on the right side was broken, and the left knee was injured. She was generally bruised and scratched, and received a severe nervous shock. It is true that she and her husband proceeded, on the same day, on their way to Hoquiam, where they were going to visit relatives. At that time it was not thought that her injuries were as serious as they subsequently proved to be. They returned from Hoquiam, on July 5th, to Tacoma, where they were residing. At the time of the injury, Mrs. Dahlstrom was eighteen years of age and had been married a little more than a month. After returning to Tacoma, her condition was such that she was confined to her bed most of the time for about three weeks. On July 10th, Dr. Wm. A. Monroe was called and he subsequently attended her. On July 25th, she was caused by the doctor to be taken to a hospital to have a correction or straightening of the uterus, and was in the

hospital for about fifteen days.   On the 21st day of February, 1916, she was again taken to the hospital to have a major operation performed, and was there for three weeks.   In this operation the right ovary was removed and a cyst removed from the left.   From the time of the injury to the time of the trial, she had been unable to do her housework, had been in bed a large part of the time, her menstruation periods had been long and painful, and the flow excessive.   Her ability to bear children has been impaired and, if a further operation should be necessary and the left ovary removed, it would be entirely destroyed.   A long time would expire before she could regain her health, if at all.   While the verdict may seem large, yet there is no exact rule by which compensatory damages in such a case can be measured.   Much must be left to the judgment of the jury.   We are not disposed to hold that the jury, in fixing the damage at $16,000, was actuated by passion or prejudice.

Another ground of the motion for a new trial was newly discovered evidence.   This related to the condition Mrs. Dahlstrom was in on the 4th day of July, while visiting relatives in Hoquiam, and the production of the family group picture in which she appears.   The purpose of the affidavit in support of the motion apparently is to show that, on that day, Mrs. Dahlstrom moved about more or less, and stood while having her picture taken, the same as the others in the group.   Upon the trial, either Mr. or Mrs. Dahlstrom, or both, testified that, on the 4th day of July, Mrs. Dahlstrom was in bed most, if not all, of the time.   This was the direct examination, but on cross-examination they admitted, perhaps somewhat reluctantly, the facts substantially as stated in the affidavit.   Whether, however, Mrs. Dahlstrom was in bed on the 4th of July, or what her condition may have been on that day, is not very material, as no one then thought that her injuries would result in the serious development which followed subsequently.   The trial court properly denied the

motion for a new trial on the ground of newly discovered evidence.

Both judgments will be affirmed.

ELLIS, C. J., and WEBSTER, J., concur.

MORRIS, J. (dissenting)—I concur in affirming liability against the railroad company upon the ground of negligence in failing to properly and timely flag the Milwaukee train, although I regard both verdicts as excessive—each should be materially reduced.

I dissent from the affirmance against the conductor, Heether. Conceding the fact as found by the jury that the conductor knew the trestle had been struck and damaged, and the further fact that he knew the Milwaukee train was approaching, what was his duty so far as respondents are concerned? Manifestly, to send someone to flag the Milwaukee train. Before he reached the trestle and could perform that duty, Russell, the brakeman had undertaken it. The proximate cause of the injury to respondents in this respect was not the failure of the conductor to order the flagging of the train, but the failure of Russell to properly flag, for which the company, and not the conductor, must respond.